IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Robert Selest Drayton,                          )
                                                )
                          Plaintiff,            )        Civil Action No.2:10-cv-02079-TMC-BHH
                                                )
            v.                                  )
                                                )        **REPORT AND RECOMMENDATION**
                                                )        **OF MAGISTRATE JUDGE**
                                                )
Jon Ozmint, Director of South Carolina          )
Department of Corrections; Bernard              )
McKie, Kirkland Correctional Institution        )
Warden; Lieutenant Beckett, Kirkland            )
Correctional Institution; Sergeant              )
Hooks, Kirkland Correctional Institution;       )
Nurse Jerry NLN, Kirkland Correctional          )
Institution a/k/a Jerry Castillo; Officer       )
Finley, Kirkland Correctional Institution;      )
and Lieutenant Ericka Martin,                   )
Kirkland Correctional Institution,              )
                                                )
                          Defendants.           )
_____ )

         The plaintiff, a state prisoner proceeding pro se, brought this action pursuant to Title

42, United States Code, Section 1983. This matter is before the Court upon Defendants'

Motion for Summary Judgment. (Dkt. No. 112.)

         Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and

Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters in cases involving *pro se* litigants are

referred to a United States Magistrate for consideration.

         The plaintiff brought this action on or about August 16, 2010. On May 11, 2011,

Defendants filed a Motion for Summary Judgment. By order filed May 12, 2011, pursuant

to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the

dismissal procedure and the possible consequences if he failed to adequately respond to

the motion.   On or about August 12, 2011, the plaintiff filed a response opposing

Defendants' Motion for Summary Judgment. (Dkt. No. 122.)

## PROCEDURAL FACTS

Plaintiff, who is currently housed at McCormick Correctional Institution ("MCI"), alleges claims pursuant to 42 U.S.C. § 1983, for incidents that occurred at Kirkland Correctional Institution ("KCI"). (See Compl.) Plaintiff alleges that on February 4, 2010, he was escorted to Room 104 of the "F1 unit segregation wing" where Inmate Eric Linnell was "already being housed." (Compl. at 3.) Plaintiff alleges that while he was escorted to the segregation wing, he was handcuffed in front so that he could carry his property and mattress. (Id.) According to Plaintiff, once in the cell, he placed his mattress and property bag down on the bottom bunk and walked "back to the door to get the handcuffs taken off . . . through the designated slot area made for both handcuffing and unhandcuffing segregation inmates before the cell door is opened." (Id.) Defendants Beckett and Hooks, who escorted Plaintiff into the cell, were already gone. (Id.) Plaintiff alleges that he "yelled out 'C.O.'" but no one was there. (Id.) Plaintiff was thus left handcuffed in the cell with another inmate.

Plaintiff alleges that Inmate Linnell assaulted him while Plaintiff was handcuffed. Plaintiff states that Linnell grabbed Plaintiff's feet and "yank[ed Plaintiff] off the bed causing [Plaintiff's] head and neck to strike the sharp edge of the bed," and that once Plaintiff hit the floor, Inmate Linnell kicked Plaintiff in the face and repeatedly kicked Plaintiff on the side of his head. (Id. at 3-4.) Plaintiff alleges Inmate Linnell then pulled out a "jailhouse shank" and "rushe[d] at [Plaintiff] while swinging the shank at [Plaintiff's] face." (Id. at 4.) Plaintiff states that he ducked to "avoid getting cut in the face and fe[lt] the shank cut [him] on the back of [his] neck" while at the same time he was "pushed head first into the door with so much force [he] almost black[ed] out." (Id.) According to Plaintiff, he spent twenty minutes handcuffed in the cell with Inmate Linnell, twelve of which Linnell spent assaulting Plaintiff. (Id.) Plaintiff alleges an inmate dorm worker ran to get help, and Defendant Hooks and

2

Defendant Finley came into the wing "and the first thing Sgt. Hooks sa[id] is that he forgot the handcuffs were still on" Plaintiff. (Id.) According to Plaintiff, upon seeing that Inmate Linnell was trying to conceal the shank, Sergeant Hooks "r[an] in the room and t[ook] it from" Inmate Linnell. (Id.) Plaintiff states he was taken out of the room and shortly thereafter taken to medical. (Id.)

Once at medical, Plaintiff alleges he saw Nurse Jerry, who "looks at the wounds on [Plaintiff's] neck, cleans it and bandages it and says it's not deep at all it's really a scratch." (Id. at 5.) Plaintiff asserts he told Nurse Jerry that his head, neck, and shoulders hurt, but that Nurse Jerry told Plaintiff to fill out a sick call request and refused to look at any injuries other than his lacerations. (Id.)

Plaintiff alleges that the next day, he spoke with Defendant Martin and explained to her what happened. (Id. at 6.) Plaintiff states that he wrote a statement about what happened and gave it to Defendant Martin "along with a request to Warden Bernard McKie explaining what happened." (Id.) On complaining about pain in his neck and shoulders as well as a migraine, he was escorted to medical "for an emergency visit" and was again seen by Nurse Jerry. (Id.) Plaintiff states, "I explained that I couldn't get any sleep because the muscles in my neck and shoulders were extremely sore and painful and that I had a very bad migraine headache since the incident," but that Nurse Jerry gave Plaintiff a pack of Motrin for the pain but did not physically examine Plaintiff. (Id.) Plaintiff alleges he filled out a sick call request on February 9, 2010; February 16, 2010; and February 22, 2010, because the Motrin was not working; he states he "was eventually put on a muscle relaxer for [his] pain." (Id.) Plaintiff complains that even though he wrote the medical supervisor at KCI about not being able to see a doctor, he was never able to see a doctor, and the medical supervisor wrote "back saying the doctor reads what the sick call nurse puts in the computer and makes his assessment that way." (Id.)

3

Plaintiff also alleges that while he was in the segregation unit, Defendant Martin "refused" to let Plaintiff "use the telephone for legal purposes which was to dial *22," which "is a line for inmates to dial to report any illegal things or assaults they witness in SCDC." (Id.)

Plaintiff alleges that on March 9, 2010, "due to the continuous harassment and continous refusal [f]or things [he] had a right to and extreme emotional distress, [he] attempted suicide." (Id. at 7.) He states, "I was continuously lied on and accused of things I was not doing, cursed out and threatened by co-workers of the defendants and refused medical sick-call repeatedly." (Id.) Plaintiff asserts he was on suicide watch for three weeks, though the normal period is seventy-two hours. (Id.)

Plaintiff states he was transferred to Ridgeland Correctional Institution ("RCI") on April 15, 2010, and was continued in "lock-up time for false disciplinary infractions [he] was charged with" after the incident at KCI. (Id.) He alleges he has "made numerous attempts to see mental health for the depression and mental health issues that stem from the incident that happened and which led to [him] attempting suicide" but that had been seen only once at RCI and was taken off his depression medication "which had bad side effects." (Id.) Plaintiff alleges he is "still making [suicide] attempts as of August, 2010." (Id.)

According to Plaintiff, after "being made aware of what took place," Defendant Ozmint "did not make an effort to rectify what was being violated and blatantly defamed Plaintiff's character without properly investigating" and is therefore "also guilty of violating Plaintiff's rights in all claims as well." (Id.)

Plaintiff seeks compensatory and punitive damages against each defendant. (Id. at 9.)

4

## APPLICABLE LAW

**Summary Judgment Motion Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" Id. (quoting Hunt v. Cromartie, 526 U.S. 541, 552 (1999)); see also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

As noted above, after Defendants filed a Motion for Summary Judgment on May 11, 2011. (Dkt. No. 112.) Defendants contend they are entitled to summary judgment for several reasons. (See Dkt. No. 112-1.) The undersigned will address Defendants' arguments in turn.[1]

---

[1]In the documents filed with his Response in Opposition, Plaintiff states that he "has attempted to subpoena key witnesses but was denied by the court. Plaintiff facts [sic] could be[] supported by these witnesses that he has no way to contact or get statements or declaration from none [sic] of his witnesses." (Dkt. No. 122-1 at 1 of 9.) In his memorandum, Plaintiff seeks relief pursuant to Rule 56(d), which provides,

  **(d) When Facts Are Unavailable to the Nonmovant**. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
  **(1)** defer considering the motion or deny it;
  **(2)** allow time to obtain affidavits or declarations or to take discovery; or
  **(3)** issue any other appropriate order.

FED. R. CIV. P. 56(d). Plaintiff states that he asks the judge to either deny Defendants' Motion for Summary Judgment or "let[ Plaintiff] interview [his] witnesses, or Defendants

**A. Defendant Castillo**

In their Motion for Summary Judgment, Defendants contend that Defendant Castillo is entitled to dismissal pursuant to Rule 12(b)(5) of the Federal rules of Civil Procedure because "Plaintiff has failed to effect proper service upon the Defendant Nurse Castillo depriving this Court of personal jurisdiction . . . ." (Mem. in Supp. at 22.)

Defendants contend Castillo should be dismissed because Castillo has not been properly served and because Castillo has moved from the state and is no longer employed by SCDC. (Id. at 22-23.) Defendants presented the Affidavit of Dr. Thomas Moore, a medical doctor employed "as Director of Doctors of the South Carolina Department." (Moore Aff. ¶ 1.) Dr. Moore states, *inter alia*,

> Former nurse Castillo is no longer employed with the South Carolina Department of Corrections having relocated with his family. While Mr. Castillo left in good standing we have no forwarding address for Mr. Castillo. Nurse Castillo worked directly under the supervision of Dr. Robert C. Bearden, Jr., a Physician II with the South Carolina Department of Corrections. Dr. Bearden is also no longer employed at KCI.

(Id. ¶ 3.)

In his Response, Plaintiff contends Castillo is not entitled to dismissal, stating that Plaintiff "attempted to serve Defendant Castillo 2 times." (Dkt. No. 122 at 1.) Plaintiff asserts

---

bring Plaintiff to court to let Plaintiff testify on [his] behalf, or somehow allow Plaintiff to obtain witness information . . . so that Plaintiff may write to witnesses to obtain declarations needed to support [the] claim." (Dkt. No. 122-1 at 7 of 9.) Plaintiff presented his declaration and included a list of the witnesses he claims will support his case as well as a description of how the witnesses will testify. (See Dkt. No. 122-2.) Plaintiff contends these witnesses will testify that certain Defendants "attempted to talk [Plaintiff] out of reporting [the] incident," that Inmate Linnell attacked Plaintiff and had a shank, that and Defendant Hooks took the shank from Inmate Linnell. (Dkt. No. 122-2 at 2-3.) The undersigned recommends denying Plaintiff relief pursuant to Rule 56(d) because Plaintiff himself has presented evidence to support these contentions. While these additional witnesses might further support Plaintiff's version of the facts, and therefore might be useful in a trial, they are unnecessary in ruling on the Motion for Summary Judgment because in ruling on this motion, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" The News & Observer Publ'g Co., 597 F.3d at 576 (quoting Hunt, 526 U.S. at 552).

that counsel for Defendant Castillo "has to know how to get in contact with him in order to represent him but has not made his whereabouts known to Plaintiff." (Id.) Plaintiff contends he does not have the ability to locate Castillo, but "counsel for defendant has a copy of complaints and summonses therefore since counsel represents defendant Castillo, then serving the counsel with a copy is efficient enough to guarantee" Castillo "is notified of complaint and summons and can be considered . . . properly served." (Id.)

In the Answer filed on behalf of Defendants, the attorney for Defendants raised the issue of service of process of Defendant Castillo. (See Dkt. No. 17 at ¶ 19.) A review of the docket indicates that Defendant Castillo was not served. (Dkt. No. 19; Dkt. No. 55; Dkt. No. 108.) Plaintiff explains why service has not been accomplished. (Dkt. No. 80; see also Resp. in Opp'n.)

Although a civil action is commenced by filing a complaint with the court, the Federal Rules of Civil Procedure require that service on defendants be effected within 120 days after the complaint is filed. See FED. R. CIV. P. 3; FED. R. CIV. P. 4(m). A defendant may challenge sufficiency of service of process and seek dismissal of the case pursuant to Rule 12(b)(5), and failure to properly serve the summons and complaint deprives the court of personal jurisdiction over that defendant. See FED. R. CIV. P. 12(b)(5); Koehler v. Dodwell, 152 F.3d 304, 306 (4th Cir. 1998); see also FED. R. CIV. P. 12(b)(2) (providing that a defendant may seek dismissal of the case for lack of personal jurisdiction).

Rule 4(m) states,

If a defendant is not served within 120 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m).

In the case *sub judice*, over 490 days have passed since Plaintiff filed his Complaint. Plaintiff has, as he states, attempted to serve Defendant Castillo twice but has been unable to do so because he is unable to locate Castillo. In an Order dated November 23, 2010, more than one year ago, the undersigned stated,

> Plaintiff **must** provide, and is responsible for, information sufficient to identify Defendants on the Forms USM-285. The United States Marshal cannot serve an inadequately identified defendant, and un-served defendants may be dismissed as parties to this case.

(Dkt. No. 55.)

The court did not dismiss Plaintiff's claim against Defendant Castillo upon the expiration of 120 days as authorized in Rule 4(m); Defendant Castillo has not yet been dismissed despite the passage of over a year. The only information before the court is that this defendant no longer resides in South Carolina and cannot be found, and Plaintiff has attempted to serve Castillo twice. Thus is does not appear that extending the time for service would be fruitful.

In the case *sub judice*, the undersigned cannot conclude that good cause for failure to serve is lacking. The undersigned declines to recommend dismissal pursuant to Rule 12(b)(5) and instead addresses Plaintiff's claims against Defendant Castillo on the merits.

## B. Exhaustion of Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Through the enactment of this statute, "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." Booth v. Churner, 532 U.S. 731, 741 (2001); see Porter v. Nussle, 534 U.S. 516 (2002); Larkin v. Galloway, 266 F.3d 718 (7th Cir. 2001) (exhaustion required even

8

though the plaintiff claimed he was afraid); see also Claybrooks v. Newsome, 18 Fed. App'x 243 (4th Cir. Sept. 18, 2001) (applying Booth v. Churner to affirm the district court's denial of relief to the plaintiff).

Defendants summarize Plaintiff's claims and divide them into eleven categories as follows:

1. Defendant Lt. Dallas Beckett and Defendant Sgt. Johnny Hook are alleged as escorting officers on February 4, 2010, to have placed Drayton in a detention cell with cellmate Eric Linnell and to have forgotten to remove his handcuffs. He alleges he was assaulted by his cellmate. These officers are alleged to have attempted to cover up their mistake in failing to remove the handcuffs by failing to report the incident.

2. Warden Bernard McKie is alleged to have been advised of the situation by Plaintiff during a March walk through where the Warden instructed Drayton to complete a grievance form. Drayton alleges that Warden McKie refused his request for immediate transfer.

3. Warden Bernard McKie is alleged to have been aware that Drayton was falsely accused of striking a Kirkland guard on the date of his transfer to another Correctional Institution.

4. Officer Martha Finley is alleged to have been notified by an inmate that Drayton's cuffs were still on and to have summoned Sgt. Hook to Drayton's cell. She is alleged to have failed to report that Inmate Linnell had a weapon.

5. Lt. Ericka Martin is alleged not to have delivered to the Warden a letter written by Drayton.

6. Lt. Martin is alleged to have refused Drayton the right to use the phone while on disciplinary lockup which included phone restriction, and further, refused to allow him to make a *22 call, which allows inmates to report illegal activities or assaults witnessed at SCDC.

7. Nurse Garcia is alleged to have been deliberately indifferent to Plaintiff's serious medical needs by treating his scratched neck but not providing prescription pain medication for his neck or shoulder bruising.

8. Nurse Garcia is alleged to have been deliberately indifferent to Plaintiff's serious medical needs by treating him on a second visit for pain in the neck and shoulder and migraines with Motrin only and refusing to prescribe narcotics and/or other medications.

9. SCDC medical staff is alleged to have been deliberately indifferent to Plaintiff's serious medical needs in not prescribing muscle relaxers on February 4, 2010 until his February 22, 2010 visit.

10. SCDC medical staff is alleged to have denied him sick call clinic while he was in Unit F-1 Segregation.

11. Former Director Ozmint is alleged to have deliberately minimized the responsibility and seriousness of incident and conducted no investigation which has allowed injury to Plaintiff's reputation.

(Dkt. No. 112-1 at 2-3; see also Compl.)

Defendants seek summary judgment on claims two through eleven on the grounds that Plaintiff failed to exhaust his administrative remedies. (See Mem. in Supp. at 23.)[2] Defendants contend that Plaintiff "elected to grieve only issues one through three and to address limited issues as set forth in issues five and seven." (Id. at 24.) Defendants contend that in order to exhaust his administrative remedies, Plaintiff was required to file Step 1 and Step 2 grievances on his claims and seek Administrative Law Court review. (Id.) Defendants state, "Because the exhaustion requirement is mandatory and this Court is given no discretion to waive exhaustion, Plaintiff's failure to properly complete the grievance procedure regarding the matters raised in issues two through eleven of his complaint is fatal to his claim." (Id.)

Ms. Hallman, Inmate Grievance Branch Chief for the South Carolina Department of Corrections, states in her Affidavit that Plaintiff "did not initiate the grievance process" on claims four through eleven. (Hallman Aff. ¶ 19.) Earlier in her Affidavit, however, she states that Plaintiff "touched upon issues in claims numbered 5 and 7." (Id. ¶ 9.) On all claims except Claim One, she states that Plaintiff "either had no administrative review as inmate Drayton either did not initiate a grievance or did not pursue his grievance process through

_____

[2]Defendants do not contend that Plaintiff failed to exhaust his administrative remedies with respect to Claim One.

Step 1, Step 2 grievance and an Administrative Law Court Appeal and thus, failed to exhaust his administrative remedies." (Id. ¶ 11.)

From a review of Ms. Hallman's Affidavit and supporting documentation, it does not appear that Plaintiff grieved the issues in Claims Six or Claims Eight through Eleven at all. Plaintiff contends that exhaustion of the handcuff claim is sufficient  because "[t]he other issues and claims occurred after and are basically supplemental[;] administrative remedies are not necessary suppose [sic] to be exhausted on issues that arise after incident that claim initially was based on." (Dkt. No. 122-1 at 3 of 9.) The undersigned disagrees with Plaintiff. Because Plaintiff failed to exhaust his administrative remedies on these claims, the undersigned recommends granting Defendants' Motion for Summary Judgment as to Claim Six and Claims Eight through Eleven. However, it is unclear from the record whether Plaintiff exhausted his administrative remedies with respect to Claims Two through Five and Claim Seven. Although Ms. Hallman states that Plaintiff did not file a Step 1 grievance, a Step 2 grievance, and appeal to the Administrative Law Court with respect to these claims, it is possible that Plaintiff completed Step 1 and Step 2 grievances. While Plaintiff may not have appealed the denial of grievances to the Administrative Law Court, the undersigned declines to dismiss Plaintiff's remaining claims for that reason. See Brown v. Evans Corr. Institution Medical Staff, No. 2:06-2464-DCN-RSC, 2007 WL 1290359, at *4 (D.S.C. Apr. 30, 2007) (Judge Norton adopted the Report and Recommendation of Magistrate Judge Carr wherein Judge Carr concluded that the plaintiff "satisfied the PLRA requirements when his Step 2 grievance was denied by SCDC"); Penza v. Patterson, No. 8:10-cv-2361-JFA-JDA, 2011 WL 5869748, at *6 (D.S.C. Oct. 26, 2011), adopted at 2011 WL 5875001 (D.S.C. Nov. 21, 2011) ("Courts within the District of South Carolina have found an inmate exhausts his administrative remedies when he completes Step 2 of the SCDC Grievance Procedure . . . . Hence, within this District, an inmate's claim is barred unless he completes Step 2 of the

11

SCDC grievance procedure with respect to that claim."). But see Maradiaga v. Bethea, No. 4:08-0226-PMD, 2009 WL 2829900 (D.S.C. Sept. 1, 2009) (finding that "to fully exhaust his administrative remedies . . . , an inmate must appeal the denial of his Step 2 Grievance to the South Carolina Administrative Law Court"). The undersigned will therefore evaluate Claims One through Five and Claim Seven on the merits.[3]

**C.    Is There a Genuine Issue of Material Fact Regarding Whether Defendants Violated Plaintiff's Constitutional Rights?[4]**

Defendants contend they are entitled to summary judgment because "Plaintiff fails to set forth factual allegations against these Defendants creating a question of fact upon the issue that Defendants deprived Plaintiff of any federally protected rights rising to a constitutional claim upon which relief may be granted." (Mem. in Supp. at 26-27.) More specifically, Defendants contend that negligence in failing to protect him from assault does not rise to the level of a constitutional violation and that Plaintiff cannot show deliberate indifference to his serious medical needs. (See generally Mem. in Supp.)

In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege (1) that he or she "has been deprived of a right, privilege or immunity secured by the Constitution

---

[3]Defendant Ozmint is entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies. However, the undersigned notes that Plaintiff does not oppose granting summary judgment to Defendant Ozmint. (See Dkt. No. 122-1 at 6 of 9.)

[4]Defendants also seek summary judgment on the grounds that they are entitled to qualified immunity. (See Mem. in Supp. of Mot. for Summ. J.) The doctrine of qualified immunity protects governmental officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When an official properly asserts the defense of qualified immunity, the official is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established, such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). Because the undersigned concludes that the facts do not rise to the level of a violation of Plaintiff's constitutional rights, Defendants are entitled to qualified immunity.

or laws of the United States," and (2) "that the conduct complained of was committed by a person acting under color of state law." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 658 (4th Cir. 1998) (citing 42 U.S.C. § 1983); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980). Defendants assert that Plaintiff cannot establish the first element: that his constitutional rights were violated.

### 1. The Handcuffs

As noted above, one of Plaintiff's claims is that Defendants failed to remove his handcuffs when he was placed in a cell with Inmate Linnell, and Plaintiff was assaulted by Inmate Linnell. Defendants are entitled to summary judgment on this claim. A review of the record reveals that the conduct of Defendant Beckett and Defendant Hooks was–at its worst–negligent. Plaintiff alleges that when Defendant Hooks and Defendant Finley came into the wing after learning Plaintiff was still wearing handcuffs, "the first thing Sgt. Hooks sa[id] is that he forgot the handcuffs were still on" Plaintiff. (Compl. at 4.) Plaintiff further alleges that he was immediately taken out of the cell, put in a shower, and then taken to medical. (Id.) Plaintiff asserted in his grievances that Defendants "forgot" to remove his handcuffs, and Plaintiff stated in his Response in Opposition that he "does not know" whether he was placed in the cell handcuffed "by mistake or intentionally or plain recklessness" but that he "was left in the handcuffs." (Dkt. No. 122-1 at 3 of 9; see also Hallman Aff. Ex. F1 & Ex. G.) The law is well settled that negligence, in general, is not actionable under § 1983. See Daniels v. Williams, 474 U.S. 327, 328-36 & n. 3 (1986); Davidson v. Cannon, 474 U.S. 344, 345-48 (1986); Ruefly v. Landon, 825 F.2d 792, 793-94 (4th Cir.1987); Pink v. Lester, 52 F.3d 73 (4th Cir.1995) (applying Daniels v. Williams and Ruefly v. Landon: "The district court properly held that Daniels bars an action under § 1983 for negligent conduct [.]"). Contrary to Plaintiff's belief, the mere fact that Defendants left Plaintiff handcuffed in a cell with another inmate, and the other inmate assaulted him, does

13

not–without more–amount to a constitutional violation. There is no evidence in the record to suggest that Defendants' actions in leaving Plaintiff handcuffed were intentional or done with malice. Moreover, there is no evidence in the record that Defendants had any knowledge that placing another inmate in a cell with Inmate Linnell would be dangerous for that inmate. Accordingly, the undersigned recommends granting summary judgment to Defendants on Claim One.

### 2. Deliberate Indifference Claim

In the instant action, Plaintiff also complains about the medical care he received following the alleged attack by Inmate Linnell. The undersigned recommends granting summary judgment to Defendants on this claim.

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104 (internal citations omitted). To prevail on an Eighth Amendment deliberate indifference claim, "a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was sufficiently serious, and (2) that subjectively the prison officials acted with a sufficiently culpable state of mind." Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998) (internal quotation marks and citations omitted). The first element "is satisfied by a serious medical condition," while the second element "is satisfied by showing deliberate indifference by prison officials." Id. It is well-settled that mere negligence does not constitute deliberate indifference. Estelle, 429 U.S. at 105-06; Grayson v. Peed, 195 F.3d 692, 695-96 (4th Cir. 1999); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (holding that "[d]isagreements between an inmate and a physician over the inmate's proper medical care" are not sufficient to raise an Eighth Amendment claim pursuant to § 1983).

14

In the case *sub judice*, Plaintiff alleged in his Complaint that after the attack, he was taken out of the room and placed in the shower where Defendant Finley removed the handcuffs. (Compl. at 4.) Plaintiff states that once Defendant Beckett arrived, Beckett and Officer Brown escorted Plaintiff to medical. (Id. at 4-5.) Plaintiff alleges that once at medical, Nurse Jerry "looks at the wounds on [Plaintiff's] neck, cleans it and bandages it and says it's not deep at all it's really a scratch." (Id. at 5.) Plaintiff contends that he told Nurse Jerry that his head, neck, and shoulders hurt, but that Nurse Jerry told Plaintiff to fill out a sick call request and refused to look at any injuries other than his lacerations. (Id.) Although Plaintiff complains that he did not receive pain medication on the date of the incident, he alleges that he saw Nurse Jerry at medical the very next day and received a pack of Motrin. (Id. at 6.) Plaintiff was "eventually put on muscle relaxers for [his] pain." (Id.)

Defendants presented Dr. Moore's Affidavit with their Motion for Summary Judgment. Dr. Moore explains that Plaintiff's medical records reveal that on February 5, 2010,

> Nurse Castillo noted a very superficial skin tear which was not bleeding but appeared reddened. The site was cleaned with a solution of saline and a band-aide was applied. [Plaintiff] Drayton was prescribed Ibuprofen 400 mg, three times a day for three days for pain as needed. This encounter was reviewed by Dr. Bearden and approved as appropriate treatment for the condition presented.

(Moore Aff. ¶ 4; see also Moore Aff. Ex. A-1.) Dr. Moore states that Plaintiff was seen by medical again on February 9, 2010, complaining that "Motrin did not seem to be helping and [stating that he] wanted a narcotic pain medication." (Moore Aff. ¶ 5.) Plaintiff was treated by Nurse Hernandez under the supervision of Dr. Lewis; Plaintiff was "advised of flexion exercises and instructed to use a rolled towel under his lower back to ease lower back discomfort." (Id.) Plaintiff was continued on "Acetaminophen 325 mg or Ibuprofen 400 mg as needed for three days," and Plaintiff was given Chlorzoxazone, which "is used to relieve pain and stiffness caused by muscle strains and sprains," which was "to be used if palpable

15

muscle spasms were present." (Id.) Plaintiff was seen again on February 16, 2010, and

examination "revealed him to have good range of motion in the neck and shoulder area";

he was continued on Motrin. (Id. ¶ 7.) Finally, when Plaintiff was seen on February 24, 2010,

> He was again instructed to use Acetaminophen 325 mg or Ibuprofen 400 mg
> as needed and Chlorzoxazone 500 mg as needed for palpable muscle
> spasms when present. He was also again instructed to perform flexion
> exercises and use a rolled towel under his lower back for discomfort. At this
> time Nurse Tonah Kaylor under the supervision of Dr. Ronald Steen, Physian
> II tried Propranolol 10 mg for headache and Robaxin for fourteen (14) days.
> Propranolol 10 mg is a beta blocker used to prevent migrane headaches.
> Robaxin is a muscle relaxant and is used with rest, physical therapy, and
> other measures to relax muscles and relieve pain and discomfort caused by
> strains . . . .

(Id. ¶ 8.)

Taking the facts in the light most favorable to Plaintiff, Plaintiff's claim for deliberate

indifference to serious medical needs fails. Plaintiff was seen by medical immediately after

the alleged attack as well as the following day and several times in the days thereafter.

While Plaintiff may have desired stronger pain medication prior to when he actually received

it, such disagreement with his treatment plan does not constitute deliberate indifference.

See Wright, 766 F.2d 841 (disagreement as to the proper medical care is not sufficient to

establish deliberate indifference to a serious medical need). Moreover, it is undisputed that

Nurse Castillo examined the scrape on Plaintiff's neck and washed and bandaged it. In

short, Plaintiff may disagree with the medical care he received, but such disagreement

alone is insufficient to establish a claim for deliberate indifference. See Tozzi v. N.C. Dep't

of Corr., 846 F.2d 74 (4th Cir. 1988) (unpublished table decision) (citing Wright v. Collins,

766 F.2d 841, 849 (4th Cir. 1985)) ("Absent exceptional circumstances, a difference of

opinion between a physician and a prisoner about the appropriate treatment of a condition

does not constitute . . . deliberate indifference."); see also Estelle, 429 U.S. at 105-06 ("[A]n

inadvertent failure to provide adequate medical care cannot be said to constitute 'an

16

unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' . . . . Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Plaintiff's claim for deliberate indifference therefore fails.

### 3. Claims against Defendant McKie

To the extent Plaintiff seeks to hold Defendant McKie responsible for the actions of other SCDC employees, that claim fails. The doctrines of vicarious liability and *respondeat superior* are generally not applicable in § 1983 actions. Vinnedge v. Gibbs, 550 F.2d 926, 927-99 (4th Cir. 1977); see also Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978) (holding "that a municipality cannot be held liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). However, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). In such a case, liability "is not premised on *respondeat superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Id. (citations omitted). A plaintiff in a supervisory liability case "assumes a heavy burden of proof," as the plaintiff "not only must demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices." Id. at 373 (internal quotation marks and citations omitted). Generally speaking, a plaintiff cannot satisfy this heavy burden of proof "by pointing to a single incident or isolated incidents," but "[a] supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id. (citations omitted). Here, the alleged attack on Plaintiff was a

17

singular incident, and Plaintiff was immediately removed from the cell and treated by medical after the attack. As discussed above, there was no constitution violation, but in any event, Warden McKie cannot be held liable for the actions of his subordinates on the facts presented in this case.

Plaintiff also seeks to hold McKie responsible for McKie's own actions. Plaintiff complains that he "personally spoke to the Warden in the month of March" when the warden came to Plaintiff's unit for inspections. (Compl. at 7.) Plaintiff states,

> The first time I spoke to Defendant Warden Bernard McKie I asked him was anything being done about me getting assaulted while left in handcuffs, he ignored me and walked away. The second time he came to the dorm I was in the shower and I asked him again and told him the last time I asked him he ignored me. His response was, "That ship has sailed there is nothing else to do about it but make sure it doesn't happen[] again." He told me the only thing he can tell me to do is fill out a grievance form which I informed him that I had already done on 2-5-2010. He responded by saying he has d[one] all that he is going to do.

(Id.) Plaintiff also states he asked McKie to be transferred to another institution "because of the harassment from the officers and the denial of things I have a right to and because it's a conflict of interest for [Plaintiff] to be around the officers after that incident." (Id.)

Assuming that Defendant McKie did not answer Plaintiff the first time Plaintiff inquired about the incident, and assuming McKie told Plaintiff the second time that there was nothing McKie could do but "make sure it doesn't happen[] again," Plaintiff's claim against McKie fails. As explained above, Defendant McKie cannot be held liable for the alleged attack on Plaintiff under the doctrine of *respondeat superior*, and McKie's own actions do not rise to the level of a constitutional violation. Both Defendant Beckett and Defendant Hooks "met separately with [McKie] and each received immediate disciplinary action for the oversight." (McKie Aff. ¶ 4.) As none of McKie's actions rise to the level of a constitutional violation; the

18

undersigned therefore recommends granting summary judgment to McKie on all of Plaintiff's claims against him.[5]

### 4. Claims against Defendant Finley

Plaintiff asserts that Officer Finley and Officer Hooks are the Defendants who came and took Plaintiff out of the cell with Inmate Linnell after the alleged attack took place. (See Compl. at 4.) According to Plaintiff, Finley is the one who put Plaintiff in the shower following the attack. (Id. at 4.) Plaintiff alleges that Finley "had common knowledge of this incident and witnessed the weapon being took [sic] from Inmate Linnell but did not report it as is her duty therefore she also violated [Plaintiff's] due process rights to decent and safe conditions in prison." (Id. at 5.) There are no other allegations against Defendant Finley in Plaintiff's Complaint. (See generally Compl.)

Assuming that Defendant Finley saw Defendant Hooks take a weapon from Inmate Linnell, Defendant Finley's alleged failure to report the taking of the weapon from Linnell does not rise to the level of a violation of Plaintiff's constitutional rights. There is no evidence that Finley–or indeed anyone–knew that Inmate Linnell had a weapon prior to the alleged attack on the Plaintiff, and Plaintiff alleges that after the attack, Sergeant Hooks took the weapon from Linnell. Given that Plaintiff alleges the weapon was taken from Linnell, and that Plaintiff was removed from Linnell's cell, Officer Finley was not deliberately indifferent to a risk of harm to Plaintiff. In fact, it appears Officer Finley was involved in abating the alleged risk of harm. Defendant Finley is entitled to summary judgment on all of Plaintiff's claims.

---

[5]The undersigned notes that in Plaintiff's Response in Opposition, Plaintiff states that he "does not oppose summary judgment" being granted to Defendant McKie. (Dkt. No. 122-1 at 6 of 9.)

**5. Claims against Defendant Martin**

It is undisputed that Defendant Martin was not present at KCI on the day Plaintiff was allegedly assaulted by Inmate Linnell. Plaintiff alleges, however, that on February 5, 2010, Plaintiff explained what happened to Defendant Martin, who told Plaintiff "she already heard about it but . . . did not have anything to do with it." (Compl. at 6.) Plaintiff alleges that he "wrote a statement about what happened and gave it to . . . Martin along with a request to Warden Bernard McKie explaining what happened." (Id.)[6]

Plaintiff's allegation that Defendant Martin failed to pass a statement Plaintiff wrote along to the Warden simply does not rise to the level of a constitutional violation. As a preliminary matter, it is unclear which constitutional right Plaintiff believes that Martin violated. Furthermore, it is undisputed that Plaintiff was able to file grievances related to the alleged attack–in fact, the first grievance related to the attack (grievance number KCI-0234-10) is dated February 5, 2010. (See Hallman Aff. Ex. D.) The undersigned therefore concludes that Defendant Martin is entitled to summary judgment.[7]

---

[6]Plaintiff alleged that Defendant Martin "refused" to let Plaintiff "use the telephone for legal purposes which was to dial *22." (Compl. at 6.) Plaintiff did not exhaust his administrative remedies on this claim. However, even considering this claim on the merits, Martin would be entitled to summary judgment. The fact that Martin allegedly did not follow SCDC policy does not, in itself, amount to a constitutional violation. See United States v. Caceres, 440 U.S. 741 (1978); see also Riccio v. County of Fairfax, Virginia, 907 F.2d 1459, 1469 (4th Cir.1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue."); Keeler v. Pea, 782 F.Supp. 42, 44 (D.S.C.1992) (violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983). Moreover, prisoners have no constitutional or federal statutory right to the use of a telephone while in prison. See United States v. Alkire, 82 F.3d 411 (4th Cir. 1996) (unpublished table decision); see also United States v. Footman, 215 F.3d 145, 155 (1st Cir. 2000) ("Prisoners have no per se constitutional right so use a telephone . . . .").

Plaintiff also alleged that Martin "continuously denied [Plaintiff] things [he] had a right to." (Compl. at 7.) This allegation is not specific and does not rise to the level of a constitutional violation, and, in any event, Plaintiff has not exhausted his administrative remedies with respect to this claim.

[7]Plaintiff states that he "does not oppose summary judgment" being granted to Defendant Martin. (Dkt. No. 122-1 at 6 of 9.)

## **CONCLUSION**

Wherefore, it is RECOMMENDED that the Defendants' Motion for Summary Judgment (Dkt. No. 112) be GRANTED.

IT IS SO RECOMMENDED.


s/Bruce Howe Hendricks
United States Magistrate Judge

December 28, 2011
Charleston, South Carolina


**The plaintiff's attention is directed to the important notice on the next page.**